1   John P. Aldrich
    Nevada State Bar No. 6877
2   **ALDRICH & BRYSON, LLP**
    1601 S. Rainbow Boulevard, Suite 160
3   Las Vegas, Nevada 89146
    Telephone: (702) 853-5490
4   Fax: (702) 853-5491

5   Brian J. Robbins (Pro Hac Vice to be submitted)
    California Bar No. 190264
6   **ROBBINS UMEDA & FINK, LLP**
    610 West Ash Street, Suite 1800
7   San Diego, California 92101
    Telephone: (619) 525-3990
8   Fax: (619) 525-3991

9   Kip B. Shuman (Pro Hac Vice to be submitted)
    Colorado Bar No. 23593
10  **SHUMAN & BERENS LLP**
    801 East 17th Avenue
11  Denver, Colorado 80218
    Telephone: (303) 861-3003
12  Fax: (303) 830-6920

13  *Attorneys for Plaintiffs*

14                  **UNITED STATE DISTRICT COURT**
                        **DISTRICT OF NEVADA**
15

16  | JOHN CARUSO, Derivatively On Behalf of SUNTERRA CORPORATION, | Case No. |
    |---|---|

17  JOHN CARUSO, Derivatively On Behalf of SUNTERRA CORPORATION,

                                Plaintiff,

18  vs.

19  NICHOLAS J. BENSON, JAMES A.
    WEISSENBORN, STEVEN E. WEST,
20  ROBERT A. KRAWCZYK, DAVID
    GUBBAY, JAMES H. DICKERSON, JR.,
21  OLOF S. NELSON, CHARLES F. WILLES,
    JOSEPH JACOBS, BRADFORD TL
22  WHITMORE and FREDERICK SIMON,

23                              Defendants,

24      -and-

25  SUNTERRA CORPORATION, a Maryland
    corporation,
26
                            Nominal Defendant
27

Case No.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SARBANES OXLEY ACT OF 2002, VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

**DEMAND FOR JURY TRIAL**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Sunterra Corporation ("Sunterra" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including violations of the Sarbanes Oxley Act of 2002 ("SOX"), violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between July 2002 and the present (the "Relevant Period") and that have caused substantial losses to Sunterra and other damages, such as to its reputation and goodwill.

2.     Throughout the Relevant Period, defendants caused or allowed Sunterra to issue statements that over inflated the Company's growth prospects. These statements also emphasized defendants supposed success in directing the Company to issue accurate and transparent financial statements. Unfortunately, Sunterra's financials were anything but accurate and transparent because those statements were based upon improper accounting for withholding taxes in Spain on wages paid to Sunterra employees. Certain of the defendants capitalized on the Company's phantom success by selling over $107 million of their personally held shares at inflated prices.

3.     On December 9, 2005, a former employee transmitted an e-mail to Company officials detailing serious allegations of improper accounting practices at the Company's European operations. On December 12, 2005, *three days later*, Sunterra's Audit and Compliance Committee ("Audit Committee") received the e-mail. *Three days* after that, on December 15, 2006, defendants Nicholas J. Benson ("Benson"), Sunterra's President and Chief Executive Officer ("CEO") and Steven E. West ("West"), Sunterra's Executive Vice President and Chief Financial Officer ("CFO"), sold 7,604 of their personally held shares for $101,133.20 in proceeds.

/ / /

4.    Rather than address the serious issues raised in the e-mail, defendants stuck their heads in the sand.  In fact, Grant Thornton LLP ("Grant Thornton"), Sunterra's independent auditors at that time, claim that defendants did not even turn the e-mail over to them until March 23, 2006—*over three months* after they received the e-mail.  Defendants deny Grant Thornton's claim.

5.    During the alleged time it took defendants to turn over the e-mail, Grant Thornton completed its audit of the Company's FY:05 financial statements and performed interim review procedures on the Company's 1Q:06 financials.  Also during those three months, the defendants on the Board of Directors (the "Board") authorized the payment of over $1.1 million in annual bonuses to the Company's highest paid executives based upon the suspect FY:05 financials, issued a proxy statement in violation of the Exchange Act and secured their re-election at the annual shareholder meeting held on February 22, 2006 despite their misfeasance.

6.    Curiously, two days before turning over the e-mail, the Audit Committee recommended and authorized the Company to fire Grant Thornton.

7.    On March 23, 2006, the Company's value declined 6.9% upon the disclosure of defendants' mishandling of the e-mail, the Company's internal controls and the Company's financial statements.

8.    On April 9, 2006, the Audit Committee belatedly authorized the retention of outside counsel to investigate the matters contained within the former employee's e-mail.

9.    Then, on May 3, 2006, defendants made a shocking disclosure.  The Company announced that its expenses had been understated by over $4 million dollars and that it was restating its FY:02 through 1Q:06 financial statements because the Company had failed to properly account for its withholding taxes in Spain on wages paid to Sunterra employees.  The $4 million represents $3.1 million in underpaid Spanish withholding taxes and $900,000 in fees and interest.

10.   On May 15, 2006, Sunterra received a letter from the staff of the NASDAQ Stock Market indicating that the Company was in risk of being delisted due to its inability to timely file its Form 10-Q for the 2Q:06.

11.     On June 2, 2006, Wells Fargo Bank, N.A. ("Wells Fargo") gave the Company a notice of default for $95 million worth of 3-3/4% senior subordinated convertible notes that the Company had issued in March 2004. Wells Fargo claims that the Company is in default due to its inability to timely file its Form 10-Q.

12.     On June 22, 2006, Sunterra's Board belatedly directed defendant Benson to take a paid administrative leave. The Board, however, is allowing Benson to maintain his post as a director of the Company. Worse yet, the Board has directed that Sunterra will continue to compensate Benson during his leave.

13.     On that same day, defendant West resigned from the Company.

14.     Between July and September 2006, numerous plaintiffs sued the Company on behalf of classes of shareholders harmed as a result of the improper statements and improper accounting.

15.     On July 5, 2006, the Securities and Exchange Commission ("SEC") started an investigation of the Company's accounting practices.

16.     On July 7, 2006, Sunterra was delisted from NASDAQ.

17.     On October 6, 2006, Sunterra entered into a supplemental indenture with Wells Fargo. In the supplemental indenture, the Company agreed to pay over $2.9 million in additional interest to note holders.

18.     Currently, Sunterra remains unable to file its 2Q:06 Form 10-Q due to the pending restatement. Moreover, the Company has yet to even hire an auditor to replace Grant Thornton. In total, the Company's value has declined by over 28% since the initial disclosure concerning the Board's mishandling of the former Sunterra employee's e-mail.

19.     As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a)     Costs incurred and diversion of manpower to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from responding to subpoenas and requests for information from

the SEC;

        (c)     Costs incurred from potential fines in connection with governmental investigations;

        (d)     Costs incurred in investigating and defending Sunterra and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

        (e)     Costs related to Sunterra's delistment from NASDAQ including fees incurred to reestablish listing on the exchange and restraints on the Company's ability to raise capital in the equity markets;

        (f)     Costs incurred from defaults of debt covenants and costs incurred from obtaining waivers of those defaults including over $2.9 million in interest paid under the supplemental indenture with Wells Fargo;

        (g)     Costs incurred from compensation, severance and benefits paid to the defendants who have breached their fiduciary duties to Sunterra;

        (h)     Costs incurred from directing manpower to correct Sunterra's defective internal controls; and

        (i)     Costs incurred from directing manpower to restate Sunterra's prior financial results to correct for the improperly accounted for Spanish withholding taxes.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including SOX and the Exchange Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of

the transactions and wrongs that are the subject of this Complaint, including the defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and conspiracy in violation of fiduciary duties owed to Sunterra, occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

22.     Plaintiff John Caruso is, and was at times relevant hereto, an owner and holder of Sunterra common stock.

23.     Nominal defendant Sunterra is a corporation organized and existing under the laws of the state of Maryland with its headquarters located at 3865 W. Cheyenne Avenue, North Las Vegas, Nevada. Sunterra, together with its subsidiaries, engages in the development, marketing, sales, financing, management, and operation of vacation ownership resorts and the points-based vacation ownership club 'Club Sunterra' in North America, Hawaii, the Caribbean, and Europe.

24.     Defendant Benson was Sunterra's President and CEO until August 2006 when he was placed on paid administrative leave. Defendant Benson is also a director of Sunterra. Because of Benson's positions, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Benson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Sunterra paid Benson the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|---|
| | 2005 | $750,000 | $520,000 | $997,500 | - | $44,694 |
| | 2004 | $576,923 | $458,250 | - | - | $31,808 |
| Benson | 2003 | $454,721 | $528,360 | - | 512,812 | $85,948 |

Defendant Benson sold 4,959 of his personally held shares for $65,954.70 in proceeds while in possession of material, non-public information concerning Sunterra's improper accounting and business prospects.

25.    Defendant James A. Weissenborn ("Weissenborn") is interim President and CEO of Sunterra and has been since June 2006. Weissenborn is a director of Sunterra and has been since April 2004. Weissenborn was Vice President of Sunterra Financial Services from October 2001 to June 2003. Because of Weissenborn's positions, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Weissenborn participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

26.    Defendant West was CFO of Sunterra until June 2006. Because of West's position, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, West participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Sunterra paid West the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| | 2005 | $393,750 | $258,750 | $532,000 | - |
| | 2004 | $288,462 | $106,000 | - | - |
| West | 2003 | $274,654 | $138,000 | - | 190,000 |

1

2   Defendant West sold 7,045 of his personally held shares for $86,387.50 in proceeds while in possession

3   of material, non-public information concerning Sunterra's improper accounting and business prospects

4         27.     Defendant Robert A. Krawczyk ("Krawczyk") is the CFO of Sunterra and has been since

5   June 2006. Krawczyk was Corporate Controller of Sunterra from August 2004 to June 2006 and Chief

6   Accounting Officer of Sunterra from May 2005 to June 2006. Because of Krawczyk's positions, he

7   knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets

8   and present and future business prospects, via access to internal corporate documents, conversations and

9   connections with other corporate officers and employees, attendance at management meetings and via

10  reports and other information provided to him in connection therewith. During the Relevant Period,

11  Krawczyk participated in the issuance of false and/or misleading statements, including the preparation

12  of the false and/or misleading press releases and SEC filings.

13        28.     Defendant David Gubbay ("Gubbay") is, and at all times relevant hereto was, a director

14  of Sunterra. Gubbay was Chairman of the Board at times relevant hereto until his resignation in October

15  2006. Because of Gubbay's position, he knew the adverse, non-public information about the business

16  of Sunterra, as well as its finances, markets and present and future business prospects, via access to

17  internal corporate documents, conversations and connections with other corporate officers and

18  employees, attendance at Board meetings and committees thereof and via reports and other information

19  provided to him in connection therewith. During the Relevant Period, Gubbay participated in the

20  issuance of false and/or misleading statements, including the preparation of the false and/or misleading

21  press releases and SEC filings.

22        29.     Defendant James H. Dickerson ("Dickerson") is a director of Sunterra and has been since

23  April 2004. Because of Dickerson's position, he knew the adverse, non-public information about the

24  business of Sunterra, as well as its finances, markets and present and future business prospects, via

25  access to internal corporate documents, conversations and connections with other corporate officers and

26  employees, attendance at Board meetings and committees thereof and via reports and other information

27

28                                  Page 8 of 49

provided to him in connection therewith.  During the Relevant Period, Dickerson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

30.    Defendant Olof S. Nelson ("Nelson") is a director of Sunterra and has been since May 2004.  Because of Nelson's position, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Nelson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

31.    Defendant Charles F. Willes ("Willes") is a director of Sunterra and has been since July 2002.  Because of Willes' position, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Willes participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

32.    Defendant Joseph Jacobs ("Jacobs") was a director of Sunterra at times relevant hereto from July 2002 until April 2004.  Because of Jacobs' position, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Jacobs participated in the issuance of false and/or misleading statements, including the preparation of the false

and/or misleading press releases and SEC filings.  During the Relevant Period, defendant Jacobs sold 5,151,937 of his personally held shares for $57,266,544.80 in proceeds while in possession of material, non-public information concerning Sunterra's improper accounting and business prospects.

33.    Defendant Bradford T. Whitmore ("Whitmore") was a director of Sunterra at times relevant hereto from July 2002 until April 2004.  Because of Whitmore's position, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Whitmore participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, defendant Whitmore sold 4,443,200 of his personally held shares for $49,693,378.30 in proceeds while in possession of material, non-public information concerning Sunterra's improper accounting and business prospects.

34.    Defendant Frederick Simon ("Simon") was a director of Sunterra at times relevant hereto from July 2002 until April 2004.  Because of Simon's position, he knew the adverse, non-public information about the business of Sunterra, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Simon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

35.    The defendants identified in ¶¶24-25, 28-34 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶24-27 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶24, 26, 32, 33 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are

referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors and/or fiduciaries of Sunterra and because of their ability to control the business and corporate affairs of Sunterra, the Individual Defendants owed Sunterra and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Sunterra in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sunterra and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

37.     Each director and officer of the Company owes to Sunterra and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sunterra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Sunterra, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Sunterra.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sunterra, and was at all times acting within the course and scope of such agency.

40.     To discharge their duties, the officers and directors of Sunterra were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Sunterra were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Sunterra conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants

complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sunterra, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Sunterra's Board during the Relevant Period.

42.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Sunterra has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred and diversion of manpower to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from responding to subpoenas and requests for information from the SEC;

(c)     Costs incurred from potential fines in connection with governmental investigations;

(d)     Costs incurred in investigating and defending Sunterra and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(e)     Costs related to Sunterra's delistment from NASDAQ including fees incurred to reestablish listing on the exchange and restraints on the Company's ability to raise capital in the equity markets;

(f)     Costs incurred from directing manpower to correct Sunterra's defective internal controls; and

(g)     Costs incurred from directing manpower to restate Sunterra's prior financial results to correct for the improperly accounted for Spanish withholding taxes.

43.     Sunterra has also been damaged as a result of the default for $95 million worth of 3-3/4% senior subordinated convertible notes that the Company had issued in March 2004. As a result, Sunterra' ability to raise capital has been impaired.

44.     Moreover, these actions have irreparably damaged Sunterra's corporate image and goodwill. For at least the foreseeable future, Sunterra will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sunterra's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

46.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Sunterra and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Sunterra, regarding the Individual Defendants' management of Sunterra's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan,

conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

47.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least July 2002 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Sunterra was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Sunterra's financial performance and future business prospects, as alleged herein.

48.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Sunterra common stock so they could: (i) dispose of over $107 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

49.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

50.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

51.     A group of real estate investors formed Sunterra in the early 1990s. The Company started with nine properties, including the Cypress Pointe Resort in Kissimmee, Florida. During 1997, the Company quickly grew—via an aggressive acquisition strategy—to over 89 resorts throughout Europe and the United States. But this phenomenal growth dissipated by early 2000 when Sunterra disclosed a $43 million write off of delinquent accounts.

52.     During the summer of 2000, the Company slipped into bankruptcy. For its last reported quarter, ended March 31, 2000, the Company reported a $15.6 million loss.

53.     The Company did not emerge from bankruptcy until July 29, 2002.

## IMPROPER STATEMENTS

54.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Sunterra a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

55.     This material, non-public information included the $4 million worth of Spanish withholding tax liabilities that would later be restated. Furthermore, defendants Dickerson, Nelson and Wiles, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the committee is responsible for: (i) discussing Sunterra's annual and quarterly financials; (ii) understanding significant judgments made and alternatives considered in the Company's financial reporting; (iii) reviewing and discussing earnings press releases; and (iv) establishing procedures for the receipt, retention and treatment of *complaints received by the Company* regarding accounting, internal controls and auditing matters.

56.     Defendants Benson, Weissenborn, Krawcyzk and West as officers of Sunterra, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Weissenborn, Benson, Dickerson,

Gubbay, Nelson, Willes, Ziegleman, Jacobs, Whitmore and Simon, as directors of Sunterra had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Sunterra to the investing public and the Company's shareholders during the Relevant Period.

57.    On August 14, 2003, Sunterra issued its first earnings press release since emerging from bankruptcy. On that date, the Individual Defendants caused or allowed the Company to issue a press release entitled "Sunterra Corporation Reports Second Quarter 2003 Earnings of $5.8 Million." The press release stated in part:

> The Company reported net income of $5.8 million for the 2003 second quarter, compared to a loss of ($14.0) million for the 2002 quarter.
>
> Sunterra achieved total revenues of $79.0 million for the three months ended June 30, 2003, compared to $72.6 million for the three months ended June 30, 2002, an increase of 8.8%. Overall revenues for domestic operations increased 8.4% to $49.3 million for the three months ended June 30, 2003 compared to $45.5 million for the three months ended June 30, 2002, and revenues from foreign operations decreased $2.7 million, or 9.9%, to $29.8 million for the three months ended June 30, 2003.
>
> ***
>
> Sunterra's Earnings Before Interest, Taxes, Depreciation and Amortization, Reorganization and Restructuring (EBITDAR) for the second quarter increased 80%, or $7.1 million, from $8.9 million in 2002 to $16.0 million in 2003 (See at-attached table for reconciliation of net income (loss) to EBITDAR and for the full definition of EBITDAR). The increase was primarily attributable to increased Vacation Interest volume, the multiple positive effects and cost reductions resulting from the Company's emergence from reorganization and implementation of the Company's restructuring programs.
>
> ***
>
> "Sunterra's results demonstrate the commitment of our management and employees to deliver a quality product to our owners and guests," stated Nicholas Benson, President and Chief Executive Officer of Sunterra Corporation. "We will continue to execute on our strategic plan, which will deliver growth and value for both our shareholders and our members, while maintaining Sunterra's position as one of the industry's leaders."

58.     On November 18, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Sunterra Corporation Notes Call-Back Information and Clarifies Earlier

Release." The press release stated in part:

> Sunterra earned net income of $4.3 million or $0.21 per share, in the three months ended September 2003. This compares to a combined $327.3 million in the prior year. Results for the third quarter 2003 included a $1.4 million impairment charge for the write-down of certain long-lived assets under SFAS 144. The prior year balance includes $239.2 million of gains on settlement and cancellation of debt and pre-petition liabilities and $112.7 million of fresh start adjustments, in connection with the Company's emergence from bankruptcy in July 2002. Excluding these items, the three-month net loss of the combined Predecessor (debtor-in-possession) entity for the one-month ended July 31, 2002 and the Successor (post emergence from bankruptcy) entity for the two months ended September 30, 2002 would have been $24.6 million.
>
> Total revenues continued the trend of earlier quarters, rising from a combined $81.1 million for the three months ended September 30, 2002 to $86.0 million for the same period in the current year, an increase of $4.9 million or 6.0%. Domestic operations produced three-month revenues of $55.6 million, up from $53.1 million in the third quarter of 2002. Our foreign operations logged $30.5 million of total revenue in the 2003 third quarter, compared to $28.1 million in 2002.
>
> On a consolidated basis, Vacation Interest revenues improved to $63.8 million from $54.9 million for the quarters ended September 30, 2003 and 2002, respectively. Our domestic resorts produced $38.6 million and $31.7 million, respectively, for these periods and our foreign operations generated $25.2 million and $23.2 million, respectively.
>
> Sunterra's third quarter Earnings Before Interest, Taxes, Depreciation and Amortization, Reorganization and Restructuring (EBITDAR -- See attached table for reconciliation of net income to EBITDAR) increased 200.4%, or $11.1 million, from $5.5 million in the third quarter 2002 to $16.6 million in 2003. This in-formation is provided because management uses it to monitor and assess the Company's performance and believes this information to be helpful to investors in understanding and evaluating the Company. Management believes these results are reflective of the cost-reduction and process improvement initiatives implemented as part our restructuring, as well as increased effectiveness by the sales team and increasing consumer awareness of vacation ownership products.
>
> Nicholas Benson, President and Chief Executive Officer of Sunterra, commented that the third quarter results were "yet another indicator that Sunterra has followed through on our restructuring plans and will continue to improve our results and our value to all of our stakeholders."

59.     On March 15, 2004, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Sunterra Corporation Reports Strong Earnings Growth for Fiscal 2003." The

press release stated in part:

Sunterra Corporation reported adjusted net in-come of $2,387,000 for the year ended December 31, 2003, compared to an adjusted net loss of ($59,012,000) in the prior year. Revenues from Vacation Interests increased by over 17% to $216,279,000 from $184,681,000 in 2002. The Company also reported an 80% increase in adjusted EBITDA to $50,489,000 from $28,082,000 last year.

Adjusted net income and adjusted EBITDA exclude a $91,586,000 charge from impairment of reorganization goodwill recorded in the fourth quarter 2003, and the prior year excludes $366,674,000 of bankruptcy-related gains and settlements.

Sunterra's President and Chief Executive Officer, Nicholas J. Benson, said: "These figures are an *unequivocal signal* that Sunterra's business is gathering *significant momentum*. Our fourth quarter results were considerably stronger than we had anticipated and despite the effects of seasonality, we delivered higher levels of adjusted EBITDA than in any single quarter in 2000, 2001 or 2002."

"The Company is now beginning to reap the benefits of our strategic re-structuring plan and the financial and operating disciplines we have imposed. Equally important to the results has been the dedication and support from our excellent team of 5,000 staff worldwide, whose commitment to Sunterra and our owners has enabled us to bring the Company to where it is today. Our prospects have not been this bright for many years – we believe that we are remarkably well positioned to deliver *sustained and substantial earnings growth*."

60.    On May 6, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Sunterra Corporation Reports $7.4 Million Growth in Earnings." The press release stated in part:

Sunterra Corporation reported net income of $697,000, or $0.03 per basic and diluted share, for the quarter ended March 31, 2004, compared to a net loss of ($6,680,000) in the prior year period, an improvement of $7,377,000. The Company also reported adjusted EBITDA of $7,723,000, up from $5,041,000 in last year's first quarter. This represents Sunterra's seventh straight quarter of year-over year growth in adjusted EBITDA.

Nicholas J. Benson, Sunterra's President and Chief Executive Officer, said: "We are pleased to report this *continuing improvement* in our results, consistent with our forecast for the year. This reflects successful execution of our strategic plan and underlines the continuing growth of our business. We will continue to leverage our operating structure as well as our global, points-based club and our many satisfied owner families, to deliver increasing value for our stakeholders."

61.    On August 2, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Sunterra Corporation Reports Strong Financial Results, Change of Fiscal Year." The press release stated in part:

Sunterra Corporation today reported net income of $7.7 million for the quarter ended June 30, 2004, up 48 percent from net income of $5.2 million for the prior-year period.

Page 19 of 49

Excluding $1.4 million of one-time gains from the sale of assets, net income for the current-year quarter rose 24 percent, to $6.3 million.

Sunterra also announced that, to more meaningfully indicate the Company's strategic, operational and financial performance, better manage its operating costs, and more cost-effectively comply with new regulatory requirements, it will adopt an October to September fiscal year, effective as of the end of the current quarter on September 30, 2004.

Nicholas J. Benson, Sunterra's President and Chief Executive Officer, said: "We are pleased to report another quarter of year-over-year growth in Vacation Interest revenues and net income. Our business has continued to improve as travelers become more aware of the value that vacation ownership brings to their holidays. Notwithstanding this overall improvement, however, we remain focused on the challenges posed by a tough European marketplace and expense pressures associated with our continued growth."

In addition to the year-over-year growth in net income, Sunterra reported that:

***

\*     Results of the Company's European operations were impacted by continued and widespread discounting in the European travel and leisure markets, with segment net income for the second quarter 2004 of $2.7 million versus $4.2 million in the year-ago period.

***

CHANGE IN FISCAL YEAR

The Company's Board of Directors has voted to change the Company's fiscal year end from December 31 to September 30. The change will become effective October 1, 2004, with the Company's 2005 fiscal year set to begin on that date and to end on September 30, 2005. Financial information for what will now be the nine-month transition period ending September 30, 2004 will be presented in the Company's Form 10-KT for the period then ended.

"Adopting a September 30 fiscal year makes a great deal of sense," said Mr. Benson. "It will provide *greater transparency* on the performance of our business, better align our financial reporting with our business cycle, help us manage our operating costs, and allow us to meet new regulatory requirements in a cost-effective manner."

Specifically:

\*     The summer months represent the peak travel period for many families, and this pattern is clearly reflected in the Company's financial results. Historically, the three-month period ending September 30 has produced larger volumes and profitability for the Company than any other quarter. As such, the change in the Company's fiscal year will more clearly indicate the degree of success achieved by that year's business initiatives.

1

2

&ast;   The change in fiscal year will move the Company's annual audit into a non-peak period, helping the Company maximize the use of management resources and control the growth of professional fees.

3

4

5

&ast;   The change will also reduce general and administrative expenses as the Company is in the midst of extensive systems process improvement initiatives and would otherwise be required to document the old processes to comply with Section 404 of the Sarbanes-Oxley Act, only to have that documentation become obsolete within a few months.

6

7

62.   On December 6, 2004, the Individual Defendants caused or allowed the Company to issue

8

a press release entitled "Sunterra Corporation Reports Continued Growth." The press release stated in

9

part:

Sunterra Corporation today reported net income of $12.9 million and Adjusted EBITDA of $23.1 million for the three months ended September 30, 2004, compared to $4.3 million and $16.6 million for the comparable 2003 period. Earnings per share was $0.50 for the quarter ended September 30, 2004, compared to $0.21 per share for the same period in 2003, despite a 30 percent increase in the number of fully diluted shares.

10

11

12

13

14

Net income and earnings per share for the nine months ended September 30, 2004 were $21.3 million and $0.89, compared to $2.8 million and $0.14 in the comparable 2003 period. Adjusted EBITDA increased by more than 20 percent to $45.9 million for the nine months ended September 30, 2004, rising $8.8 million from the $37.1 million posted in the 2003 nine month period.

15

16

17

18

Nicholas Benson, president and chief executive officer, said: "The results we achieved in the current period reflect the *strength of our global operations*. Despite severe hurricanes in the United States and *challenging market conditions in Europe*, Sunterra more than doubled net income and generated double-digit improvements in revenues and Adjusted EBITDA for the three and nine month periods."

19

63.   On February 8, 2005, the Individual Defendants caused or allowed the Company to issue

20

a press release entitled "Sunterra Corporation Reports Continuing Strong Growth; $5.8 Million of Net

21

Income." The press release stated in part:

Sunterra Corporation today reported net income of $5.8 million, or $0.24 per share for the three months ended December 31, 2004, reversing a loss in the comparable period a year ago of $92.0 million, or $4.60 per share. Adjusted EBITDA for the three months ended December 31, 2004 was $17.7 million, versus $13.4 million for the comparable prior year period.

22

23

24

25

Excluding impairment charges of $92.5 million, the Company's net income for the quarter ended December 31, 2003, was $0.5 million, or $0.03 per share. The impairment charge was primarily related to goodwill.

26

27

The December 2004 quarter was the first quarter since Sunterra's reorganization in which the Company has recorded a provision for federal and state income tax expense

28

in the United States for financial reporting purposes. The Company noted that after utilization of pre-emergence net operating losses, it expects the actual tax burden for federal and state income tax purposes to be significantly lower than the amount provided for financial reporting purposes.

Nicholas Benson, president and chief executive officer, said: "Sunterra has once again delivered a quarter of strong financial results. This is a *continuing solid performance* by the company and with *further development planned for 2005* pursuant to our *global business strategy*, I am confident in our ability to drive excellent returns from the business."

64.    On May 9, 2005, the Individual Defendants caused or allowed the Company to issue a

press release entitled "Sunterra Corporation Reports Record Results for Quarter." The press release

stated in part:

Sunterra Corporation today reported net income of $2.5 million, or $0.12 per diluted share, for the three months ended March 31, 2005, a more than three-fold improvement over net income in the comparable prior-year period of $0.7 million, or $0.03 per diluted share. Adjusted EBITDA for the three months ended March 31, 2005, was $13.8 million, up from $7.7 million for the comparable prior-year period. Vacation interest revenues for the March 2005 quarter increased more than 15 percent, to $60.3 million, compared to the prior-year mark of $52.1 million.

Nicholas Benson, president and chief executive officer, said: "These results represent the highest levels of vacation interest revenue, adjusted EBITDA and net income that Sunterra has reported for a March quarter since the start of this decade, and were achieved *despite difficult market conditions in the European region.* Our customer base continues to endorse SunOptions as the 'global currency of relaxation,' redeeming them for cruises, airline tickets and miles and, of course, accommodation at our network of nearly 100 vacation ownership resorts."

65.    On August 9, 2005, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Sunterra Corporation Reports Third Quarter Results." The press release stated

in part:

Sunterra Corporation today reported results for its third fiscal quarter ended June 30, 2005. The company's underlying performance reflects strong demand in North America, the successful integration of recent acquisitions and improvement in North American marketing efficiencies. The results also include previously announced charges relating to its European operations.

Sunterra reported a net loss of $50.1 million, or $2.50 per diluted share, for the third quarter, including a restructuring charge of $0.9 million, and a $55.0 million charge for impairment of goodwill, as discussed in the news release issued on July 11, 2005. Excluding these charges, net income for the three months ended June 30, 2005, was $5.5 million, or $0.24 per diluted share, compared with net income of $7.7 million, or $0.33 per diluted share in the third quarter a year ago. The 2004 third quarter included an additional $1.3 million of recognized gain on sales of assets. During the 2004 period, the

company realized approximately $0.5 million from favorable settlements of litigation relating to a former subsidiary. In the third quarter last year, the North American segment utilized post-emergence net operating losses to offset pre-tax income. Post-emergence net operating losses were utilized within fiscal 2004, whereas the fiscal 2005 reported financial statements reflect statutory rates.

Adjusted EBITDA for the three months ended June 30, 2005, was $18.9 million, an increase of 26 percent from $15.1 million for the comparable prior-year period.

"Sunterra has continued to deliver *record operating profits*," said Nicholas Benson, president and chief executive officer. "While implementing a responsible streamlining in Europe, we are maintaining a corporate growth strategy which creates value for our members and shareholders. We are pleased to have announced the addition of three quality vacation ownership resorts to the Sunterra family since the start of the third quarter, and will continue to deploy our strong balance sheet in pursuing similarly attractive opportunities."

## THE BOARD RECEIVES A REVEALING E-MAIL

66.     On December 9, 2005, a former employee transmitted an e-mail to Company officials detailing serious allegations of improper accounting practices at the Company's European operations. On December 12, 2005, *three days later*, Sunterra's Audit Committee received the e-mail. *Three days* after that, on December 15, 2006, defendants Benson and West sold 7,604 of their personally held shares for $101,133.20 in proceeds.

67.     The next day on December 13, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Sunterra Corporation Reports Results and Outlook." The press release stated in part:

Sunterra Corporation today reported net income for its fiscal fourth quarter ended September 30, 2005, of $7.2 million, or $0.30 per diluted share, compared to $12.9 million, or $0.54 per diluted share in the 2004 September quarter. The current year quarter included $1.3 million of non-recurring charges, while the prior year period included $3.0 million of non-recurring gains and utilized all then-remaining post-emergence net operating losses, realizing a tax benefit of approximately $3.6 million.

For the year ended September 30, 2005, the company reported a net loss of $34.7 million, including a $55.0 million impairment charge, and $2.0 million of restructuring charges. In the twelve months ended September 30, 2004, Sunterra reported a net loss of $70.7 million, including impairment charges of $92.5 million and $8.1 million of non-recurring gains, and additionally realized nearly $5 million of tax benefits from the use of all then-remaining post-emergence net operating losses.

Adjusted EBITDA for the quarter ended September 30, 2005, was $22.8 million compared to $23.1 million in the prior-year period. For the twelve-month period ended

September 30, 2005, adjusted EBITDA rose nearly 24 percent to $73.3 million, from $59.3 million in the prior year.

Nicholas Benson, Sunterra's president and chief executive officer, said: "This quarter closes off a fiscal year in which Sunterra has once again delivered *strong EBITDA growth* in the vanguard of its industry peer group. I am proud of all that our worldwide team members have accomplished during a period which has presented us with both challenges and opportunities. Our new fiscal year has gotten underway broadly in line with our expectations and I expect *our continued performance in fiscal 2006 will reflect the momentum* that we have enjoyed thus far."

68.     On February 14, 2006, the Individual Defendants caused or allowed the Company to issue a press release entitled "Sunterra Corporation Reports Strong Growth." The press release stated in part:

Sunterra Corporation today issued its financial results for the company's fiscal first quarter ended December 31, 2005, reporting strong increases in revenues, operating income, adjusted EBITDA, direct contribution from vacation interests and cash flows compared to results for the prior year.

Nicholas Benson, Sunterra's president and chief executive officer, said: "This has been another quarter of powerful growth for Sunterra. The improvements in our revenues, earnings, and cash flows and the liquidity of our balance sheet reflect the *underlying strength* of our business. These impressive results are driven by our North American business, which has turned in another solid quarter. The acquisitions we have made in the last 12 months are also making their presence felt. North America is a strong market in which we operate an effective business and I have no reason to believe we will see anything other than continuing robust growth for the foreseeable future."

69.     The December 13, 2005 and February 13, 2006 press releases conspicuously omitted the fact that the Board and Audit Committee had received an e-mail detailing serious allegations of improper accounting practices at Sunterra.

**DEFENDANTS BELATEDLY TURN THE E-MAIL OVER TO THE AUDITORS**

70.     Rather than address the serious issues raised in the December 9 e-mail, the Individual Defendants stuck their heads in the sand. Grant Thornton claims that the Individual Defendants waited until March 23, 2006 to turn the e-mail over to them. Defendants deny Grant Thornton's claim.

71.     During the alleged time it took the Individual Defendants to turn over the e-mail, Grant Thornton completed its audit of the Company's FY:05 financial statements and performed interim review procedures on the Company's 1Q:06 financials. Also, between December 2005 and March 23, 2006, the Director Defendants authorized the payment of over $1.1 million in annual bonuses to the Company's

highest paid executives based upon the suspect FY:05 financials, issued a proxy statement in violation of the Exchange Act and secured their re-election at the annual shareholder meeting held on February 22, 2006 despite their misfeasance.

72.     On April 11, 2006, *Bloomberg* published a story concerning the fiasco that was entitled "Sunterra Shares Fall as Ex-Accountant Notes Concerns." The article stated in part:

> Shares of Sunterra Corp. *fell 6.9 percent* after the company reported that its former accountant said more time is needed to investigate allegations concerning accounting irregularities in European operations.
>
> Sunterra, which runs almost 100 timeshare resorts in 13 countries, said in a filing yesterday that accountant Grant Thornton LLP challenged its March 21 dismissal in a letter to the U.S. Securities and Exchange Commission. Grant Thornton said in the letter that *it was unaware of charges made by a former Sunterra employee until March 23, after it had completed an audit of financial statements for the year ended Sept. 30*.

## THE FULL TRUTH IS REVEALED

73.     Then, on May 3, 2006, the Company announced that its expenses had been understated by over $4 million dollars and that it was restating its FY:02 through 1Q:06 financial statements. The $4 million represents $3.1 million in underpaid Spanish withholding taxes and $900,000 in fees and interest.

74.     As a result of the devastating restatement announcement, Sunterra's shareholders soon gathered that material facts had been improperly omitted from the Company's statements described above. These material facts, which were known or should have been known by each of the Individual Defendants, included the following:

(a)     the Company's reported expenses were materially understated;

(b)     the Company's reported net income was materially inflated;

(c)     the Board and Audit Committee had received an e-mail from a former employee in December 2005, but failed to disclose that e-mail or turn it over to the Company's independent auditor until March 2006; and

(d)     as a result of the above, the Company's projections for FY:06 were improperly inflated.

**AFTERMATH**

75. On May 15, 2006, Sunterra received a letter from the staff of the NASDAQ Stock Market indicating that the Company was in risk of being delisted due to its inability to timely file its Form 10-Q for the 2Q:06.

76. On June 2, 2006, Wells Fargo gave the Company a notice of default for $95 million worth of 3-3/4% senior subordinated convertible notes that the Company has issued in March 2004. Wells Fargo claims that the Company is in default due to its inability to timely file its Form 10-Q.

77. On June 22, 2006, the Board belatedly directed defendant Benson to take an administrative leave. The Board, however, is allowing Benson to maintain his post as a director of the Company. Worse yet, the Board has dictated that Sunterra will continue to compensate Benson during his leave.

78. On that same day, defendant West resigned from the Company.

79. Between July and September 2006, numerous plaintiffs sued the Company on behalf of classes of shareholders harmed as a result of the improper statements and improper accounting.

80. On July 5, 2006, the SEC started an investigation of the Company's accounting practices.

81. On July 7, 2006, Sunterra was delisted from NASDAQ.

82. On October 6, 2006, Sunterra entered into a supplemental indenture with Wells Fargo. In the supplemental indenture, the Company agreed to pay over $2.9 million in additional interest to note holders.

83. Currently, Sunterra remains unable to file its 2Q:06 Form 10-Q due to the pending restatement. Moreover, the Company has yet to hire an auditor to replace Grant Thornton.

84. Between April 2006 and the present, in the resulting aftermath following the disclosures concerning the Board's botched handling of the revealing e-mail and the restatement, Sunterra's value has declined 22% per share. As a result, Sunterra has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred and diversion of manpower to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from responding to subpoenas and requests for information from the SEC;

(c)     Costs incurred from potential fines in connection with governmental investigations;

(d)     Costs incurred in investigating and defending Sunterra and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(e)     Costs related to Sunterra's delistment from NASDAQ including fees incurred to reestablish listing on the exchange and restraints on the Company's ability to raise capital in the equity markets;

(f)     Costs incurred from defaults of debt covenants and costs incurred from obtaining waivers of those defaults including over $2.9 million in interest paid under the supplemental indenture with Wells Fargo;

(g)     Costs incurred from directing manpower to correct Sunterra's defective internal controls; and

(h)     Costs incurred from directing manpower to restate Sunterra's prior financial results to correct for the improperly accounted for Spanish withholding taxes.

85.     Sunterra has also been damaged as a result of the default for $95 million worth of 3-3/4% senior subordinated convertible notes that the Company had issued in March 2004. As a result, Sunterra's ability to raise capital has been impaired.

86.     Moreover, these actions have irreparably damaged Sunterra's corporate image and goodwill. For at least the foreseeable future, Sunterra will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sunterra's ability to raise equity capital or debt on favorable terms in the future is now impaired.

87.     In addition to the damages described above, Sunterra's market capitalization has been damaged by over $142 million. At the same time that the defendants were causing Sunterra to suffer such devastation, the Insider Selling Defendants fared much better by selling over $107 million of their personally held stock.

## IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD

88.     As a result of the Individual Defendants' improprieties, Sunterra has now been forced to admit that it inappropriately accounted for Spanish withholding taxes in its FY:02 through 1Q:06 results, and has restated those results to remove $4 million in improperly reported income, such that its FY:02 through 1Q:06 financial statements were not a fair presentation of Sunterra's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules. The FY:03 through 1Q:06 results were included in Forms 10-Q and 10-K filed with the SEC. The results were also included in press releases disseminated to the public.

89.     The FY:03 through 1Q:06 Forms 10-Q and 10-K were reviewed, prepared and/or endorsed by the Individual Defendants. The following chart details the defendants and other individuals who signed and certified these filings under SOX:

| Date | Filing | Person(s) Who Signed and Certified |
|------|--------|-------------------------------------|
| 04/15/03 | 10-K | Nicholas J. Benson (President and Chief Executive Officer and Director), Steven E. West (Chief Financial Officer), James F. Anderson (Vice President, Corporate Controller), David Gubbay (Director), Joseph Jacobs (Director), Frederick Simon (Director), Bradford T. Whitmore (Director), Charles F. Willes (Director) **SOX CERTIFICATION** Nicholas J. Benson, Steven E. West |
| 05/14/03 | 10-Q | James F. Anderson (Senior Vice President and Corporate Controller), Nicholas J. Benson, Steven E. West **SOX CERTIFICATION** Nicholas J. Benson, Steven E. West |
| 08/14/03 | 10-Q | Coral M. Hansen (Vice President and Corporate Controller), Nicholas J. Benson, Steven E. West **SOX CERTIFICATION** Nicholas J. Benson, Steven E. West |
| 11/14/03 | 10-Q | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Senior Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson, Steven E. West |

| | | | |
|---|---|---|---|
| 03/15/04 | 10-K | | Nicholas J. Benson (President and Chief Executive Officer and Director), Steven E. West (Chief Financial Officer), David Gubbay (Director), Frederick Simon (Director), Bradford T. Whitmore (Director), Charles F. Willes (Director) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |
| 05/11/04 | 10-Q | | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Senior Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson, Steven E. West |
| 08/11/04 | 10-Q | | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Senior Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson, Steven E. West |
| 12/17/04 | 10-KT | | Nicholas J. Benson (President and Chief Executive Officer and Director), Steven E. West (Chief Financial Officer), David Gubbay (Chairman of the Board and Director), James H. Dickerson, Jr. (Director), Olof S. Nelson (Director), James A. Weissenborn (Director), Charles F. Willes (Director) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |
| 02/09/05 | 10-Q | | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Senior Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |
| 05/10/05 | 10-Q | | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Senior Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |
| 8/9/205 | 10-Q | | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Executive Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |
| 12/14/05 | 10-K | | Nicholas J. Benson (President and Chief Executive Officer and Director), Steven E. West (Executive Vice President and Chief Financial Officer), Robert A. Krawczyk (Vice President and Corporate Controller), David Gubbay (Chairman of the Board and Director), James H. Dickerson, Jr. (Director), Olof S. Nelson (Director), James A. Weissenborn (Director), Charles F. Willes (Director) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |
| 02/14/06 | 10-Q | | Nicholas J. Benson (President and Chief Executive Officer), Steven E. West (Executive Vice President and Chief Financial Officer) **SOX CERTIFICATION** Nicholas J. Benson (Chief Executive Officer), Steven E. West (Chief Financial Officer) |

90.     The SOX certifications signed in conjunction with the filing of Sunterra's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Sunterra's FY:03 Form 10-K that was signed by defendants Benson and West:

I, [Nicholas J. Benson/Stephen E. West], [President and Chief Executive Officer/ Vice President and Chief Financial Officer], certify that:

1.      I have reviewed this annual report on Form 10-K of Sunterra Corporation;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

     a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared; and

     b.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report; and

     c.      Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors:

     a.      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

1
2
3

       b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting; and

4        91.    GAAP are those principles recognized by the accounting profession as the conventions,

5 rules and procedures necessary to define accepted accounting practice at a particular time.  SEC

6 Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which

7 are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite

8 footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply

9 with GAAP, with the exception that interim financial statements need not include disclosures which

10 would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-

11 01(a).

12       92.    The fact that Sunterra will restate its financial statements for FY:03 through the1Q:06

13 is an admission that the financial statements originally issued were false and that the overstatement of

14 revenues and income was material. Under GAAP, as set forth in Accounting Principles Board Opinion

15 ("APB") No. 20, the type of restatement announced by Sunterra was to correct for material errors in its

16 previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  The restatement of past financial

17 statements is a disfavored method of recognizing an accounting change as it dilutes confidence by

18 investors in the financial statements, it makes it difficult to compare financial statements and it is often

19 difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, ¶14.

20 Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*,

21 when there is a change in the reporting entity, there is a change in accounting principles used or to

22 correct an error in previously issued financial statements. Sunterra's restatement was not due to a change

23 in reporting entity or a change in accounting principles, but rather to errors in previously issued financial

24 statements.  Thus, the restatement is an admission by Sunterra that its previously issued financial results

25 and its public statements regarding those results were false.

26
27
28

Page 31 of 49

93.    Due to the Individual Defendants' improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.   To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.   Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

/ / /

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

## ILLEGAL INSIDER SELLING

94.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Sunterra stock:

| Filer Name | Transaction Dates | Shares | Price | Proceeds |
|---|---|---|---|---|
| JACOBS | 09/05/2003 | 66,700 | $11.70 | $780,390.00 |
| JACOBS | 09/09/2003 | 125,000 | $11.45 | $1,431,250.00 |
| JACOBS | 09/16/2003 | 175,000 | $11.45 | $2,003,750.00 |
| JACOBS | 09/17/2003 | 7,500 | $11.45 | $85,875.00 |
| JACOBS | 09/18/2003 | 165,000 | $11.45 | $1,889,250.00 |
| JACOBS | 10/07/2003 | 205,000 | $11.20 | $2,296,000.00 |
| JACOBS | 10/08/2003 | 52,500 | $11.05 | $580,125.00 |
| JACOBS | 10/08/2003 | 700,000 | $11.20 | $7,840,000.00 |
| JACOBS | 10/08/2003 | 1,000,000 | $11.00 | $11,000,000.00 |
| JACOBS | 10/09/2003 | 77,400 | $11.05 | $855,270.00 |
| JACOBS | 10/10/2003 | 6,500 | $11.05 | $71,825.00 |
| JACOBS | 10/14/2003 | 60,893 | $11.40 | $694,180.20 |
| JACOBS | 10/14/2003 | 2,500,000 | $11.05 | $27,625,000.00 |
| JACOBS | 01/06/2004 | 7,000 | $10.87 | $76,090.00 |
| JACOBS | 01/07/2004 | 3,444 | $10.90 | $37,539.60 |
| | | 5,151,937 | | $57,266,544.80 |
| | | | | |
| WHITMORE | 8/27/2003 | 66,416 | $11.75 | $780,593.89 |
| WHITMORE | 08/27/2003 | 176,584 | $11.75 | $2,075,409.41 |
| WHITMORE | 08/28/2003 | 217,000 | $11.75 | $2,549,750.00 |

| | | | | |
|---|---|---|---|---|
| WHITMORE | 09/05/2003 | 66,700 | $11.75 | $783,725.00 |
| WHITMORE | 10/07/2003 | 105,000 | $11.25 | $1,181,250.00 |
| WHITMORE | 10/08/2003 | 52,500 | $11.10 | $582,750.00 |
| WHITMORE | 10/08/2003 | 1,000,000 | $11.05 | $11,050,000.00 |
| WHITMORE | 10/09/2003 | 27,400 | $11.10 | $304,140.00 |
| WHITMORE | 10/09/2003 | 50,000 | $11.10 | $555,000.00 |
| WHITMORE | 10/10/2003 | 6,600 | $11.10 | $73,260.00 |
| WHITMORE | 10/14/2003 | 100,000 | $11.45 | $1,145,000.00 |
| WHITMORE | 10/14/2003 | 2,500,000 | $11.10 | $27,750,000.00 |
| WHITMORE | 10/15/2003 | 75,000 | $11.50 | $862,500.00 |
| | | 4,443,200 | | $49,693,378.30 |
| | | | | |
| WEST | 05/11/2004 | 3,000 | $10.94 | $32,820.00 |
| WEST | 10/07/2005 | 100 | $13.07 | $1,307.00 |
| WEST | 10/07/2005 | 100 | $13.08 | $1,308.00 |
| WEST | 10/07/2005 | 200 | $13.10 | $2,620.00 |
| WEST | 10/07/2005 | 200 | $13.12 | $2,624.00 |
| WEST | 10/07/2005 | 200 | $13.14 | $2,628.00 |
| WEST | 10/07/2005 | 600 | $13.17 | $7,902.00 |
| WEST | 12/15/2005 | 2,645 | $13.30 | $35,178.50 |
| | | 7,045 | | $86,387.50 |
| | | | | |
| BENSON | 12/15/2005 | 4,959 | $13.30 | $65,954.70 |
| | | 4,959 | | $65,954.70 |
| | | | | |
| | | | | $107,112,665.70 |
| TOTAL | | 9,607,141 | | |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95. Plaintiff brings this action derivatively in the right and for the benefit of Sunterra to redress injuries suffered, and to be suffered, by Sunterra as a direct result of the violations of SOX and the Exchange Act, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Sunterra is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96. Plaintiff will adequately and fairly represent the interests of Sunterra in enforcing and prosecuting its rights.

97. Plaintiff is and was an owner of the stock of Sunterra during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the

1  Company.

2      98.     The current Board of Sunterra consists of the following seven individuals: defendants

3  Gubbay, Benson, Dickerson, Nelson, Weissenborn and Willes and John D. Ziegelman ("Ziegelman").

4  Plaintiff has not made any demand on the present Board of Sunterra to institute this action because such

5  a demand would be a futile, wasteful and useless act.

6      99.     Defendants Gubbay, Benson, Dickerson, Nelson, Weissenborn and Willes were directors

7  of the Company during December 2005 when the Company received a revealing e-mail from a former

8  employee. Under their fiduciary duties owed to Sunterra, these defendants should have directed a proper

9  investigation of the e-mail and turned the e-mail over to Grant Thornton, the Company's independent

10  auditor. Defendants Dickerson, Nelson and Willes, as members of the Audit Committee, had a specific

11  duty under the Audit Committee's charter to properly handle the e-mail.  Specifically, the charter

12  provides that these defendants were responsible for establishing procedures for the receipt, retention and

13  treatment of *complaints received by the Company* regarding accounting, internal controls and auditing

14  matters. Rather than fulfill their duties to the Company, Grant Thornton claims that defendants Gubbay,

15  Benson, Dickerson, Nelson, Weissenborn and Willes did not turn the e-mail over to the auditors until

16  March 23, 2006. During the time it took defendants to turn over the e-mail: (i) Grant Thornton audited

17  the Company's FY:05 financial statements and performed interim review procedures on the Company's

18  1Q:06 financials; (ii) the Board authorized over $1.1 million in incentive compensation to be paid to

19  Sunterra's highest paid executives based upon the inaccurate FY:05 financials; and (iii) the Director

20  Defendants directed Sunterra to issue a proxy to secure their re-election to the Board despite their

21  misfeasance. These defendants' acts were in conscious disregard of their fiduciary duties and are not the

22  product of valid business judgment. Accordingly, demand is futile as to defendants Gubbay, Benson,

23  Dickerson, Nelson, Weissenborn and Willes.

24      100.    Defendants Dickerson, Nelson and Willes were, during the Relevant Period, members

25  of the Audit Committee. The Audit Committee is responsible, by its charter, for: (i) discussing

26  Sunterra's annual and quarterly financials; (ii) understanding significant judgments made and alternatives

27

28                                    Page 35 of 49

considered in the Company's financial reporting; (iii) reviewing and discussing earnings press releases; and (iv) establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters. Thus, the Audit Committee was responsible for overseeing and directly participating in Sunterra's financial reporting process. Accordingly, defendants Dickerson, Nelson and Willes breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper financial statements and earnings press releases that contained false and/or misleading material information. Particularly, these defendants reviewed and failed to correct Sunterra's improper earnings press releases described above. These defendants also reviewed and failed to correct Sunterra's improper Forms 10-Q and 10-K filed during its FY:02 through 1Q:06. As a result, Sunterra has been forced to restate its previously filed financials for those years. Thus, defendants Dickerson, Nelson and Willes face a sufficiently substantial likelihood of liability for their breach of fiduciary duties any demand upon them is futile.

101.    Defendant Benson's fellow Board members recently forced him to take a paid administrative leave. Although he has managed to retain his position on the Board, his future as a Sunterra executive is seriously threatened. Specifically, defendant Benson enjoyed the following compensation as President CEO of Sunterra:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|------------------------|
|           | 2005        | $750,000 | $520,000 | $997,500 | - | $44,694 |
|           | 2004        | $576,923 | $458,250 | - | - | $31,808 |
| Benson    | 2003        | $454,721 | $528,360 | - | 512,812 | $85,948 |

Accordingly, defendant Benson can not consider plaintiff's demand that he take action on behalf of Sunterra against his fellow Board members because he has an interest in protecting the positions and compensation to which he still clings. Thus, demand is futile as to defendant Benson.

102.    Defendant Dickerson, by his specialized financial expertise, was in a unique position to understand the business of Sunterra, as well as its finances, markets and present and future business

prospects. Specifically, defendant Dickerson is Executive Vice President, Operational Support Services, CFO and Treasurer of HealthNow New York, Inc. From May 1998 to May 2000, Dickerson was Executive Vice President and CFO of Caremark RX, Inc. Before May 1998, Dickerson was Senior Vice President and CFO of Aetna U.S. Healthcare. This defendant, because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of Sunterra's financials. Nonetheless, defendant Dickerson breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

103. Defendant Willes, by his specialized financial expertise, was in a unique position to understand the business of Sunterra, as well as its finances, markets and present and future business prospects. Specifically, defendant Willes was Executive Vice President and CFO of ISCO International, Inc. from 2000 to 2002. This defendant, because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of Sunterra' financials. Nonetheless, defendant Willes breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

104. Defendant Weissenborn, by his specialized financial expertise, was in a unique position to understand the business of Sunterra, as well as its finances, markets and present and future business prospects. Specifically, defendant Weissenborn, during 1999, was CFO of Ilitch Holdings, Inc. This defendant, because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of Sunterra's financials. Nonetheless, defendant Weissenborn breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

105. The Compensation Committee of the Board reviews and approves the compensation of the Company's executive officers and recommends compensation for the Company's directors. On December 12, 2005, the Board including the members of the Compensation Committee received a revealing e-mail from a former employee that suggested that Sunterra's FY:05 financials were inaccurate. The Compensation Committee, however, ignored the e-mail and used those FY:05 financials to

determine and authorize the payment of incentive compensation to Sunterra's executives—including over $1.1 million in bonuses paid to Sunterra's highest paid executives. Thus, the Compensation Committee consciously disregarded its fiduciary duties owed to the Company when it approved the incentive compensation based upon financials, which they knew or should have known to be inaccurate. The approval of the incentive compensation was not the product of valid business judgment. Thus, defendants Nelson, Dickerson, Gubbay and Willes face a sufficiently substantial likelihood of liability for their breaches of fiduciary duties and demand upon them is futile.

106.   The Compensation Committee's lack of business judgment is also demonstrated by their decision to continue paying defendant Benson despite his involvement in the wrongdoing alleged herein. Thus, demand is futile as to defendants Nelson, Dickerson, Gubbay and Willes.

107.   Because the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Nelson, Dickerson, Gubbay and Willes. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Benson and Weissenborn is futile.

108.   Defendant Benson knew the adverse, non-public information regarding the improper accounting as a result of his access to and review of internal corporate documents, attendance at Board meetings, and conversations and connections with other corporate officers, employees and directors. Benson, however, participated in the illegal insider selling. Specifically, Benson sold 4,959 shares of Sunterra stock for proceeds of $65,954.70. Benson's sales came *just three days after* the Board received the December 7, 2006 e-mail detailing serious allegations of improper accounting practices. Because defendant Benson received a personal financial benefit from the challenged insider trading transactions, he is interested. Also, defendant Benson faces a sufficiently substantial threat of liability for breach of his fiduciary duties for insider selling. Since defendant Benson has breached his fiduciary duties and is interested, any demand upon him is futile.

109.   Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

Page 38 of 49

110.    The Director Defendants of Sunterra, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Sunterra's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

111.    In order to bring this suit, all of the directors of Sunterra would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

112.    The acts complained of constitute violations of the fiduciary duties owed by Sunterra's officers and directors and these acts are incapable of ratification.

113.    Each of the Director Defendants of Sunterra authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

114.    Any suit by the current directors of Sunterra to remedy these wrongs would likely expose the Individual Defendants and Sunterra to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

115.    Sunterra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sunterra any part of the damages Sunterra suffered and will suffer thereby.

116.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount

likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

117.    If Sunterra's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Sunterra. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Sunterra against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Sunterra, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Sunterra to sue them, since they will face a large uninsured liability.

118.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Sunterra for any of the wrongdoing alleged by plaintiff herein.

119.    Plaintiff has not made any demand on shareholders of Sunterra to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Sunterra is a publicly held company with over 19 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(c)   Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I
### Against Defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes for Violation of Section 14(a) of the Exchange Act

120.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.   The Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders which were contained in the Company's proxy statement (the "Proxy") issued on January 30, 2006. The Proxy contained a proposal to Sunterra's shareholders that they elect six directors of the Company—defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes. The Proxy, however, misrepresented and failed to disclose that, on December 9, 2006, the Company had received a revealing e-mail from a former employee that challenged the veracity of the Company's financial statements. The Proxy also failed to disclose that—as Grant Thornton claims—the Board was improperly withholding that e-mail from the Company's independent auditors who were actively engaged in finalizing the audit of the Company's FY:05 financial statements. By reasons of the conduct alleged herein, the Director Defendants, who were directors that caused or allowed the issuance of the Proxy, violated §14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Sunterra's shareholders were misled and/or deceived by these defendants' false portrayal of defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes' handling of their fiduciary duties as Sunterra directors.

122.   This information would have been material to Sunterra's shareholders in determining whether or not to elect defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes to the Board.

123.   Plaintiff, on behalf of Sunterra, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Benson, Gubbay, Nelson, Dickerson,

Weissenborn and Willes based upon the misleading and incomplete proxy materials. Plaintiff, on behalf of Sunterra, also seeks to rescind the election of defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes.

## COUNT II

### Against Defendants Benson and West for Disgorgement under the Sarbanes-Oxley Act of 2002

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives. Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

> (a)    **Additional compensation prior to noncompliance with commission financial reporting requirements**. If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –*

> > 1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

> > 2.    any profits realized from the sale of securities of the issuer during that 12-month period.

> (b)    **Commission exemption authority**. The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

126.    Sunterra will restate its financial statements filed from 2002 to the present due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act

of 2002. As a result, defendant Benson, as Sunterra's CEO, and defendant West, as Sunterra's CFO, are required to reimburse Sunterra for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002) through the present.

127.    Further, defendants Benson and West also are liable to Sunterra for any profits realized from the sales of securities by the Company during that same period of time.

128.    Defendants Benson and West are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Sunterra.

### COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Sunterra common stock on the basis of such information.

131.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Sunterra common stock.

132.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Sunterra common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

133.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT IV**

**Against All Defendants for Breach of Fiduciary Duty**

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The Individual Defendants owed and owe Sunterra fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Sunterra the highest obligation of good faith, fair dealing, loyalty and due care.

136.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

137.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

138.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sunterra has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

139.    Plaintiff on behalf of Sunterra has no adequate remedy at law.

**COUNT V**

**Against All Defendants for Abuse of Control**

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sunterra, for which they are legally responsible.

142.    As a direct and proximate result of the Individual Defendants' abuse of control, Sunterra

Page 44 of  49

has sustained significant damages.

143.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.    Plaintiff on behalf of Sunterra has no adequate remedy at law.

### COUNT VI

### Against All Defendants for Gross Mismanagement

145.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sunterra in a manner consistent with the operations of a publicly held corporation.

147.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sunterra has sustained significant damages in excess of hundreds of millions of dollars.

148.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff on behalf of Sunterra has no adequate remedy at law.

### COUNT VII

### Against All Defendants for Waste of Corporate Assets

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have

caused Sunterra to waste valuable corporate assets by: (i) paying incentive based bonuses to certain of its executive officers; (ii) continuing to pay compensation to defendant Benson despite his involvement in the wrongdoing alleged herein; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

152.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

153.    Plaintiff on behalf of Sunterra has no adequate remedy at law.

### COUNT VIII

### Against All Defendants for Unjust Enrichment

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Sunterra.

156.    Plaintiff, as a shareholder and representative of Sunterra, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    **Declaring that defendants Benson and West are liable under §302 of the Sarbanes-Oxley Act of 2002, and requiring them to reimburse Sunterra for all bonuses or other incentive based or equity based compensation received by them during the period in which Sunterra will**

restate its financial results;

C.     Declaring and decreeing that defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes caused the Company to act in violation of §14(a) of the Exchange Act;

D.     Rescinding the election of defendants Benson, Gubbay, Nelson, Dickerson, Weissenborn and Willes to the Sunterra Board;

E.     Directing Sunterra to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sunterra and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     control and limit insider stock selling;

3.     a provision to permit the shareholders of Sunterra to nominate at least three candidates for election to the Board;

4.     a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

5.     appropriately test and then strengthen the internal audit and control functions.

F.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Sunterra has an effective remedy;

G.      Awarding to Sunterra restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

H.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.       Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: November 8th, 2006          ALDRICH & BRYSON, LLP


_John P. Aldrich_
_____
JOHN P. ALDRICH

1601 S. Rainbow Boulevard, Suite 160
Las Vegas, Nevada 89146
Telephone: 702/853-5490
Facsimile: 702/853-5491

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
SHANE P. SANDERS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

SHUMAN & BERENS LLP
KIP B. SHUMAN
JEFFREY A. BERENS
801 East 17th Avenue
Denver, Colorado 80218
Telephone: 303/861-3003
Facsimile: 303/830-6920

*Attorneys for Plaintiff*

Page 48 of 48

## SUNTERRA VERIFICATION

I, John Caruso, hereby verify under the penalty of perjury that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: _Sept. 5, 2006_

John Caruso